**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

JAMES KERR,

          Plaintiff,

    v.

BOROUGH OF PETERSBURG, *et al.*,

          Defendants.

Case No. 1:23-cv-00008-SLG

## ORDER ON ALL PENDING MOTIONS

Before the Court are three pending motions: (1) Defendants' Motion for Partial Summary Judgment Re: Qualified Immunity at Docket 32; Plaintiff responded in opposition at Docket 86, to which Defendants replied at Docket 105; Plaintiff filed a sur-reply at Docket 116; (2) Defendants' Motion for Summary Judgment at Docket 75; Plaintiff responded in opposition at Docket 97, to which Defendants replied at Docket 112; and (3) Defendants' Motion to Strike Plaintiff's Expert Gregg Erickson's Trial Testimony and Expert Report at Docket 80; Plaintiff responded in opposition at Docket 85, to which Defendants replied at Docket 92. Oral argument was not requested on any of these motions and was not necessary to the Court's determination.

## BACKGROUND

This is a lawsuit by Plaintiff James Kerr, the Police Chief for the Borough of Petersburg, against Defendants Borough of Petersburg Manager Stephen Giesbrecht and the Borough of Petersburg ("Borough"), for allegedly violating

Kerr's First Amendment rights, defaming him, and portraying him in a false light.[1] The facts, viewed in the light most favorable to Kerr on Defendants' summary judgment motions, are as follows:

Giesbrecht is the Borough Manager. He was appointed to that role by the Borough Assembly ("Assembly"), and the Assembly may remove him at any time by a majority vote.[2] As Manager, Giesbrecht is "the chief administrative officer of the borough, responsible to the assembly for the administration of all day to day borough affairs placed in the manager's charge by Charter, Borough Code or assembly direction."[3] As part of his duties as Manager, in 2018, Giesbrecht selected Kerr to fill the Police Chief position with the Borough.[4] In accordance with Borough code, the Assembly ratified Kerr's selection as Police Chief.[5] As set out in the code, the Police Chief role is an administrative one, and Giesbrecht is Kerr's

---

[1] Docket 1-2 at 33-35.

[2] Petersburg, Alaska, Mun. Code § 3.12.010 (2025), https://library.municode.com/ak/petersburg/codes/borough_code_of_ordinances. ("The borough assembly shall appoint a borough manager for an indefinite term and determine the manager's compensation."); Petersburg, Alaska, Charter Art. 4, § 4.01 (2025), https://library.municode.com/ak/petersburg/codes/borough_code_of_ordinances?nodeId=CH. ("The assembly may suspend or remove the manager at any time by a vote of the majority of the assembly.").

[3] Petersburg, Alaska, Mun. Code § 3.12.010 (2025).

[4] Docket 86-2 at 37-38 (Giesbrecht Dep.); Docket 1-1 at 48-53; *see* Docket 1-1 at 54-55 (Police Chief job description).

[5] Docket 86-2 at 36 (Giesbrecht Dep.); Petersburg, Alaska, Mun. Code § 3.34.020(A) (2025) ("The police chief is an administrative officer of the borough appointed by the borough manager, with the approval of the borough assembly.").

supervisor.[6]  Giesbrecht may only terminate Kerr for just cause.[7]  The job description for the position provides that the Police Chief "ensures that laws, ordinances and policies are consistently enforced" and "[c]onfers with and represents the department and the Borough in meetings with the members of the Borough Assembly."[8]

Regarding the Assembly's relationship with Borough personnel, of which Kerr is one, the Borough code provides

> Neither the borough assembly nor any of its members may recommend, direct or request the appointment or removal of any person to or from borough office or employment except as may be otherwise provided in the borough Charter or this Code. The assembly and its individual members shall deal with the administrative service of the municipality solely through the borough manager. Neither the assembly nor its individual members may give orders on administrative matters to any subordinate of the borough manager, either publicly or privately.[9]

Further, pursuant to the Borough code, "the determination of all matters of policy shall be vested" in the Assembly.[10]  The Assembly also has the power "[b]y ordinance to enact legislation relating to any or all subjects and matters not

---

[6] Petersburg, Alaska, Mun. Code § 3.34.020(B) (2025) ("The police chief shall carry out the duties and responsibilities of the police department under the supervision and control of the manager.").

[7] *Id.* § 3.34.020(A) ("The police chief may be terminated by the manager only for just cause.").

[8] Docket 1-1 at 54-55.

[9] Petersburg, Alaska, Mun. Code § 3.08.050 (2025); *see* Petersburg, Alaska, Charter Art. 2, § 2.10(B) (2025) ("Subordinates of the borough manager shall report to and obtain direction from the borough manager and not from the assembly, the mayor or individual assembly members.").

[10] Petersburg, Alaska, Mun. Code § 3.08.040 (2025).

prohibited by law" and to "inquire into the conduct of any office, department or agency of the borough, and investigate municipal affairs."[11]

In 2020, the COVID-19 pandemic began. In December 2020, Donald Trump Jr. visited Petersburg; Kerr met him at the airport, took a photo with him inside the airport without a face mask, and posted the photo on his personal Facebook page.[12] At the time, a public health mandate approved by the Assembly required that face masks be worn inside Petersburg buildings open to the public.[13]

In further response to the COVID-19 pandemic, in November 2021, the Assembly passed an emergency ordinance requiring that face masks be worn in public places, but the ordinance did not include a specific enforcement mechanism, providing only that "[t]he Borough reserves the right to use all available enforcement options to assure compliance with this emergency ordinance."[14] Shortly thereafter, the Assembly considered a proposal to amend the ordinance to apply to communal areas, provide for a fine for noncompliance with the mask mandate, and require businesses and building owners to deny admittance to individuals who were noncompliant with the mask mandate.[15]

---

[11] *Id.* § 3.08.040(A), (C).

[12] Docket 86-1 at ¶ 10 (Kerr Decl.).

[13] Docket 32-6.

[14] Docket 32-9 at 2-3.

[15] Docket 75-6.

On November 17, 2021, the Assembly held a public meeting to discuss the proposed amendment.[16] Before the meeting, Kerr asked the Mayor of Petersburg and Giesbrecht if he could make a statement at the meeting providing his views on whether the mask mandate should be enforceable.[17] Both instructed Kerr to sign up with Debra Thompson, the Borough Clerk, for public comment at the meeting.[18] The meeting occurred while Kerr was out of the state; at the designated time, he appeared at the meeting via videoconference.[19] The Borough Clerk identified him as Jim Kerr, and he began his statement by saying "this is my personal statement and not the stance or opinion of the Petersburg Borough."[20] He stated that, "[f]rom my personal experience, fully vaccinated people brought COVID into the police department, who then gave it to unvaccinated people," and

---

[16] Docket 75-7; "Borough Assembly Regular Meeting," Petersburg, Alaska (Nov. 17, 2021), https://www.petersburgak.gov/bc-borough/page/borough-assembly-regular-meeting-10. The Assembly ultimately adopted an amendment extending the original ordinance to also apply in communal areas in buildings. Docket 32-10.

[17] Docket 86-1 at ¶¶ 12-13 (Kerr Decl.).

[18] Docket 86-1 at ¶¶ 12-13 (Kerr Decl.). Kerr asserts that he said he was going to speak in his private capacity, and that is how Giesbrecht understood his request to speak. Docket 86-1 at 12-13 (Kerr Decl.). Giesbrecht testified that had Kerr been in town during the Assembly meeting, he would have asked Kerr to attend. Docket 75-12 at 4 (Giesbrecht Dep.) ("[I]t would have been a meeting that if Jim would have been in town, I probably would have asked him to be there. . . . that's the kind of things that department heads routinely speak about, which is ordinances or changes that might affect their area, and so they're there to answer questions from the Assembly.").

[19] Docket 86-1 at ¶ 14 (Kerr Decl.).

[20] Docket 75-7 at 1.

"[o]fficers have contracted COVID at work."[21] Kerr also stated that

> If you want the mask mandate enforced, it will be enforced, but only until officers get hired by another police department. We have highly trained officers in Petersburg who would be an asset to any police department. Currently, police departments are actively recruiting in Alaska, offering 10,000 to 20,000 dollar recruitment bonuses, along with higher wages and lower cost of living. . . . [I]f we start enforcing mandates and ordinances that divide this community further, officers will move from Petersburg because of the quality of life and conflicts.

> Let me be clear. I do not support enforcing masking -- mask mandates or ordinances. The Petersburg police department has worked hard to build a positive relationship with the community it serves. Voting yes on enforcing masking allows the assembly to hide behind their vote while they destroy the community's relationship among neighbors, the police department, and local government. Sending officers with guns and arrest powers to a masking complaint is absurd. Using the police department to enforce a masking violation should be viewed as excessive force.[22]

In the days after Kerr made his statement, Assembly Members Jeff Meucci and David Kensinger voiced their disapproval of the statement to Giesbrecht. For example, Meucci emailed Giesbrecht and said that, while Kerr's statement began in his capacity as a private citizen, it quickly "veered into comments that were clearly spoken as a police chief and supervisor of our police department"; Meucci stated he wanted Kerr's statement to be a topic of discussion at the next Assembly meeting.[23] Giesbrecht informed Kensinger that the Borough code and charter

---

[21] Docket 75-7 at 1-2.

[22] Docket 75-7 at 2-3

[23] Docket 32-12 at 1-2; Docket 75-8 at 1.

precluded the Assembly and individual Assembly Members from interfering with the job performance of a Borough employee.[24]  Kensinger responded, sharing his opinion that "[o]nce [Kerr] started talking about officers and how they would react, he was presenting as the Chief and NOT a private citizen expressing his views," and telling Giesbrecht that it was Giesbrecht's "responsibility to communicate what is appropriate personal communication versus a presentation that was in my opinion an attempt to use the threat of employee action to influence the assembl[y's] direction."[25]

Additionally, Kensinger and Meucci began making more inquiries into the police department than usual.[26]   On January 13, 2022, Kensinger emailed Giesbrecht inquiring into which officers Kerr had hired, suggesting that the police department was overstaffed, asking Giesbrecht to have Kerr control overtime accruals, and suggesting that "Kerr needs help or replaced."[27]   Giesbrecht characterized Meucci and Kensinger's focus on the police department as "overly

---

[24] Docket 32-12 at 3-4.

[25] Docket 32-12 at 3-4; Docket 75-9 at 1.

[26] Docket 86-2 at 5-6, 18-19 (Giesbrecht Dep.); Docket 32-4 at 119 (January 13, 2022, email from Kensinger to Giesbrecht asking which police officers Kerr had hired and suggesting that Kerr needs to control overtime); Docket 32-4 at 81 (February 11, 2022, email from Meucci to Giesbrecht and Thompson asking for a report regarding police department operations manual, crime and motor vehicle statistics, domestic violence calls and arrests, police department salaries, and removal of police department employees from union); Docket 32-4 at 85 (February 16, 2022, email from Meucci to Giesbrecht inquiring into upcoming sniper training for Kerr and two other officers); Docket 32-4 at 83 (February 18, 2022, response email from Kerr to Meucci providing details on planned sniper training).

[27] Docket 32-4 at 120-21.

aggressive."[28]

On January 14, 2022, Giesbrecht prepared an evaluation of Kerr's performance during the prior year.[29] The evaluation identified three "strengths"— Kerr's knowledge of police practices, focus on team development, and integration into the community—and outlined three "opportunities for improvement"—political decision making, budget development and management, and general leadership.[30] Regarding Kerr's political decision making, the performance evaluation stated that "Jim has had some missteps regarding communication both in person and on social media. The COVID discussion with the Assembly was inappropriate, and the publishing of the airport picture with no mask during the pandemic was ill-advised."[31]

On March 16, 2022, Borough Clerk Thompson sent a memorandum to Kerr to "confirm receipt of your complaint of harassment, raising allegations of workplace harassment against you by an Assembly Member or Members."[32] Thompson informed Kerr that, in her role as Director of Human Resources for the Borough, she had opened an investigation into the matter and that Kerr would be

---

[28] Docket 86-2 at 5-6 (Giesbrecht Dep.).

[29] Docket 32-4 at 103.

[30] Docket 32-4 at 103.

[31] Docket 32-4 at 103.

[32] Docket 32-13; Docket 32-14.

contacted by Peter Diemer, an attorney, who would be conducting the investigation with Borough Attorney, Sara Heideman.[33]  Thompson also asked Kerr for "a copy of the timeline document that [he] mentioned in [their] initial meeting."[34]  In his declaration, Kerr states that he received the memorandum while he was in Thompson's office and he "immediately told her that [he] was not complaining about 'workplace harassment' and disagreed with that characterization in the memorandum."[35]  Kerr states that Thompson told him "this is what Heideman is calling it" and that Kerr should address any issues with Diemer.[36]

In response to Thompson's request, on March 22, 2022, Kerr submitted a "Timeline/Overview of events" ("Timeline") to Thompson.[37]  In the Timeline, Kerr described the Borough's implementation of masking and testing COVID-19 requirements and discussions about the enforcement of those measures in January 2021.[38]  The Timeline noted Kerr's statement at the Assembly meeting in November 2021 and Kerr's opinion that following that statement, he had been subjected to "[c]onstant retaliation from my speech against masking

---

[33] Docket 32-13.

[34] Docket 32-13.

[35] Docket 86-1 at ¶ 15 (Kerr Decl.).

[36] Docket 86-1 at ¶ 15 (Kerr Decl.).

[37] Docket 1-1 at 57-61; Docket 32-4 at 28-32; Docket 86-1 at 4.

[38] Docket 32-4 at 28.

enforcement."[39]  The Timeline described that Giesbrecht and Kerr had discussed Kerr's statement and that Giesbrecht had told Kerr that he was allowed to make the statement but "cautioned [Kerr] on future statements" and they "[c]ame up with a plan to consult [Giesbrecht] in the future."[40]  In the Timeline, Kerr also stated that Meucci and Kensinger wanted Giesbrecht to fire Kerr after he made the statement to the Assembly and that Meucci and Kensinger were making "busy work" for Kerr.[41]  The Timeline also recounted that Giesbrecht "documented [the Assembly meeting statement] in [Kerr's] performance evaluation saying he had to do something so he could tell [Kensinger] he did something about it to get him to stop," and that Giesbrecht told Kensinger "what he [was] doing is harassment."[42]

After meeting with Diemer in April 2022, Kerr submitted a three-page document titled "Additional information and clarification from yesterday's meeting" to the Borough Clerk clarifying the concerns he had raised at a meeting the day before regarding the conduct of Kensinger and Meucci.[43]  In the document, Kerr

---

[39] Docket 32-4 at 29.

[40] Docket 32-4 at 29.

[41] Docket 32-4 at 29-31.

[42] Docket 32-4 at 29.

[43] Docket 86-9; Docket 86-1 at ¶ 17 (Kerr Decl.).  Kerr suggests that the Borough considered this document to be his complaint.  Docket 86 at 53-54 ("At his deposition, Giesbrecht clarified that the 'complaint' was a 3-page document entitled 'Additional information and clarification from yesterday's meeting.' . . . But in this very document, which the Borough understood to be Plaintiff's complaint, he specifically clarifies that his issues were related to 'retaliation and intimidation' from Kensinger and Meucci and not 'workplace harassment.'" (citing Docket 86-2 at 62-65 (Giesbrecht Dep.)))  Defendants contend that Kerr sent the document to Diemer during

stated that his reference to "harassment" during the meeting was "in no way" related to the "workplace harassment definition which involves race, color, religion, sex gender, national origin, age."[44]  Rather, Kerr stated his issues pertained to "retaliation and intimidation" by these Assembly members related to Kerr's speech to the Assembly on November 17, 2021.[45]

On June 14, 2022, Giesbrecht provided Kerr with a summary of the results of Diemer's investigation.[46]  As summarized by Giesbrecht, the investigation concluded that Kerr's November 17, 2021, statement violated Petersburg Police Department Procedures Rule 125 based on a finding that Kerr had used his official capacity to "coerce or persuade any person to follow any course of political action."[47]  Giesbrecht also informed Kerr that the investigation concluded that his statement was not protected by the First Amendment whether or not Kerr was a policymaker.[48]  Further, Giesbrecht advised that the investigation concluded that

---

the investigation "in a post-hoc attempt to clarify the scope of the alleged harassment in his complaint."  Docket 32-1 at 13 (citing Docket 32-4 at 118 (including only the first page of the three-page document)).

[44] Docket 86-9 at 1.  Specifically, Kerr stated "Yesterday I made reference to harassment, but this is in terms of the act/dictionary definition 'aggressive pressure or intimidation.'  In no way was my reference of harassment related to the workplace harassment definition which involves race, color, religion, sex[,] gender, national origin, age."

[45] Docket 86-9 at 1; *see* Docket 32-4 at 118 (same).

[46] Docket 32-17.

[47] Docket 32-17 at 1.

[48] Docket 32-17 at 1-2

there was no substantial evidence of workplace bullying or harassment.[49]  The summary also noted that Kerr "did not allege that [he] [was] being discriminated against based upon race, color, religion, sex, national origin, age, disability, marital status, or parenthood."[50]

The investigation report also advised Giesbrecht to provide additional details in Kerr's performance evaluation.[51]  Thereafter, on June 22, 2022, Giesbrecht amended the January 14, 2022, performance evaluation of Kerr to explain that

> Jim's November 17, 2021 statement at the Assembly meeting was inappropriate (a) by advocating against enforcement of the mask mandate, and (2) while he did not purport to speak on behalf of the Department, he spoke to police department internal operations and asserted a position on enforcement of an ordinance and on the use of force ("[i]f you want the mask ordinance enforced, it will be enforced but only until officers get hired by another department"; "sending officers with guns and arrest powers to a masking complaint is absurd" and "should be viewed as excessive force.") Also, the publishing of his picture taken at the airport with a celebrity traveling through town, with no mask on during the pandemic, was ill-advised.[52]

After receiving a public information request from a local radio station, KFSK, on June 27, 2022, Giesbrecht provided a statement to KFSK and a redacted copy of Kerr's Timeline.[53]  The statement represented that Kerr had filed a "complaint,

---

[49] Docket 32-17 at 2

[50] Docket 32-17 at 2.

[51] Docket 32-4 at 1-2.

[52] Docket 32-16 at 1-3.

[53] Docket 75-19.  Heideman contacted Kerr's attorney to discuss the confidentiality of Kerr's Timeline in response to the public records request.  Docket 32-19 at 1.

in the form of a timeline" that "alleg[ed] that he was the subject of harassment from Assembly Members Jeff Meucci and Dave Kensinger," and that "an investigation, conducted by an outside attorney[,] . . . found harassment had not occurred."[54]

On June 28, 2022, Giesbrecht sent an email to Kerr saying that "[w]hile I cannot control what Jeff, Dave or others say, it is important that you do not respond in a negative fashion. . . . If the KFSK story and Dave or Jeff's comments are critical, you will need to not respond in kind."[55] That same day, KFSK posted a story quoting the statement provided by Giesbrecht.[56] The story also suggested that Kerr opposed requiring COVID-19 testing.[57] On June 28, 2022, Kerr sent an email to the reporter at KFSK to clarify that he "never complained about requiring testing."[58] Kerr's email did not comment on the story's statement that Kerr's "complaint allege[d] harassment by assembly members Jeff Meucci and Dave Kensinger."[59]

On July 5, 2022, Giesbrecht asked Kerr to direct all inquiries and discussions

---

[54] Docket 75-19.

[55] Docket 32-21.

[56] Docket 75-20.

[57] Docket 75-20.

[58] Docket 1-2 at 5. On June 30, 2022, Kerr sent another email to the reporter in which he stated, "[m]y complaint for harassment did not include any objection to covid testing." Docket 1-2 at 5. Giesbrecht wrote this response for Kerr. Docket 97-2; Docket 97-3 at 9 (Giesbrecht Dep.).

[59] Docket 75-20 at 2.

with the public or local press regarding Kerr's complaint to Giesbrecht.[60] Giesbrecht testified that around this time he was concerned about potential pressure from Meucci and Kensinger to fire Kerr and to be more aggressive in monitoring Kerr's job performance.[61] On July 7, 2022, Giesbrecht sent an email to Kerr with the subject "Policy Guideline." The email stated that it was "intended to address any public statements to be made by you to the Assembly, other Boards and Commissions, and the media."[62] The email recounted that "[t]he investigatory report recommends guidance on this point, and your attorney has also requested that the Borough provide written instructions on future public statements to prevent any further misunderstandings."[63] In the email, Giesbrecht wrote Kerr that

> As a policymaker for the Borough, it is very difficult for the public to separate you from the office you hold. This is very much like my position in this way. Even if you include language at the beginning of a statement you are only expressing your personal views, this will often be insufficient for the public to distinguish you from your position as the Borough Police Chief. This is especially true if you were discussing matters within the purview of the Police Department or your job duties.

> Accordingly, in the future, please present to me, in writing, any public statement you wish to make to the Assembly, other Board and Commission, or the media (excluding standard press releases addressing arrests or police criminal investigations within the

---

[60] Docket 32-23.

[61] Docket 86-2 at 19-22 (Giesbrecht Dep.) (explaining audio recording of conversation between Giesbrecht and Kerr on July 5, 2022, filed conventionally with the Court as Exhibit V, Docket 32-24).

[62] Docket 32-25 at 1.

[63] Docket 32-25 at 1.

Borough). This will allow me to review and analyze the statement beforehand, to ensure it is clear from the subject, content and context you are not representing the Borough or Department in your statement (unless it is an official departmental statement), it will not interfere with or impede the Borough's implementation of policy or efficiency in providing services, and it will not otherwise disrupt or detrimentally impact the performance of your duties, the operations or functions of the police department, or your working relationship with the Assembly or other Board or Commission.[64]

Kerr alleges that Giesbrecht also required Kerr to meet with a professional coach to help improve Kerr's relationship with Assembly Members.[65]

Kerr filed this suit in state court in November 2022; Defendants removed the case to federal court on August 24, 2023.[66] The Complaint raises three claims for damages against the Borough and Defendant Giesbrecht: (1) violation of Kerr's First Amendment right to free speech pursuant to 42 U.S.C. § 1983; (2) defamation under state law; and (3) false light under state law.[67] Kerr also seeks injunctive relief pursuant to Article I, § 5 of the Alaska Constitution.[68] Defendants assert that they are entitled to qualified immunity on Kerr's state law claims for damages and Giesbrecht is entitled to qualified immunity on the § 1983 claim.[69] Defendants also

---

[64] Docket 32-25 at 1.

[65] Docket 75-3 at 12-13.

[66] Docket 1-1 at 1-8; Docket 1.

[67] Docket 1-2 at 160-63, ¶¶ 40-46, 57-62.

[68] Docket 1-2 at 161-62, ¶¶ 47-56.

[69] Docket 32-1.

maintain they are also entitled to summary judgment on the merits.[70]

## JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this civil action includes a claim arising under federal law, 42 U.S.C. § 1983. The Court exercises supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a).

## LEGAL STANDARDS

### I.   Summary Judgment

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The burden of showing the absence of a genuine dispute of material fact lies with the movant.[71] If the movant meets this burden, the non-moving party must demonstrate "specific facts showing that there is a genuine issue for trial."[72] The non-moving party may not rely on "mere allegations or denials"; rather, to reach the level of a genuine dispute, the evidence must be such "that a reasonable jury could return a verdict for the non-moving party."[73] When considering a motion for summary judgment, a

---

[70] Docket 32-1 at 1-2 & n.1; Docket 75 at 34.

[71] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[72] *Id.* at 324 (quoting Fed. R. Civ. P. 56(e) (1986)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[73] *Anderson*, 477 U.S. at 248-49 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S.

court views the facts in the light most favorable to the non-moving party and draws "all justifiable inferences" in the non-moving party's favor.[74]

## II.    *Monell* Liability

A local governing body is not liable under § 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort."[75]    "[A] municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."[76]   Liability of a municipality under § 1983 "may attach when an employee is acting pursuant to an expressly adopted official policy, longstanding practice or custom, or as a final policymaker."[77]

## III.    Qualified Immunity for § 1983 Claims

Under the doctrine of qualified immunity, government officials "are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[78]   "[M]unicipalities sued under § 1983, unlike individuals, are not

---

253, 288 (1968)).

[74] *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

[75] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).

[76] *Id.* (emphasis in original).

[77] *Thomas v. Cnty. of Riverside*, 763 F.3d 1167, 1170 (9th Cir. 2014).

[78] *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

entitled to immunity, qualified or otherwise."[79]   Thus, Defendants seek qualified immunity on Kerr's § 1983 claim solely as to Giesbrecht.

The qualified immunity analysis consists of two prongs: a defendant is entitled to qualified immunity unless he has "(1) violated a constitutional right that (2) was clearly established at the time of the violation."[80]   Both prongs must be established.  At summary judgment, "[u]nder the first prong [courts] ask whether, '[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [defendant's] conduct violated a constitutional right?'"[81]  Regarding the second prong, courts begin "by defining the law at issue in a concrete, particularized manner."[82]   Courts "compare[] the factual circumstances faced by the defendant to the factual circumstances of prior cases to determine whether the decisions in the earlier cases would have made clear to the defendant that his conduct violated the law."[83]   A case directly on point is not necessary, but "existing case law must have put every reasonable official on notice that their conduct was unconstitutional"[84] and "placed the statutory or constitutional question

---

[79] *Horton v. City of Santa Maria*, 915 F.3d 592, 603 (9th Cir. 2019).

[80] *Polanco v. Diaz*, 76 F.4th 918, 925 (9th Cir. 2023).

[81] *Ballentine v. Tucker*, 28 F.4th 54, 61 (9th Cir. 2022) (internal quotation marks and citation omitted).

[82] *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir. 2017).

[83] *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 674 (9th Cir. 2021).

[84] *Martinez v. High*, 91 F.4th 1022, 1031 (9th Cir. 2024) (internal quotation marks and citation omitted).

beyond debate."[85] "The plaintiff bears the burden of proving that the right allegedly violated was clearly established" at the time of the violation.[86]

The judge, not the jury, decides whether a right is clearly established.[87] But when the historical facts relevant to the qualified immunity issue are in dispute, a defendant is entitled to summary judgment based on qualified immunity only if, taking the facts in the light most favorable to the plaintiff, the defendant did not violate any clearly established constitutional right.[88] If reasonable jurors could find that the defendant violated the plaintiff's constitutional right, and the right at issue was clearly established, the case should proceed to trial.[89] After the jury has determined the facts, and if it finds that there was a constitutional violation, the judge then determines whether the right that was violated was clearly established.[90]

---

[85] *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

[86] *Gordon v. Cnty. of Orange*, 6 F.4th 961, 969 (9th Cir. 2021) (internal quotation marks and citation omitted).

[87] *Morales v. Fry*, 873 F.3d 817, 823 (9th Cir. 2017) ("[C]omparing a given case with existing statutory or constitutional precedent is quintessentially a question of law for the judge, not the jury.").

[88] *Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008).

[89] *Id.*; *see also LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 953 (9th Cir. 2000) ("If … there is a material dispute as to the facts regarding what the officer or the plaintiff actually did, the case must proceed to trial, before a jury if requested.").

[90] *Morales,* 873 F.3d at 823 ("[O]nly the jury can decide the disputed factual issues, while only the judge can decide whether the right was clearly established once the factual issues are resolved.").

## IV. Qualified Immunity Under Alaska Law

Under Alaska law, qualified immunity protects government employees from tort suits for discretionary acts committed within the scope of their authority.[91] Qualified immunity for government employees "applies only 'when discretionary acts within the scope of the official's authority are done in good faith and are not malicious or corrupt.'"[92]  However, under Alaska law, "a municipality does not automatically share the protection of its employees' personal immunity."[93]  "A claim against a municipality or the State raises an issue of sovereign immunity, and the government defendant is immune only if the claim challenges a 'planning' decision."[94]  "'[P]lanning' generally refers to policymaking."[95]

"Where qualified immunity is raised by the moving party as grounds for summary judgment, the nonmoving party, in order to avoid summary judgment, must present some admissible evidence that creates an issue of fact as to whether the official acted in bad faith or with an evil motive."[96]

---

[91] *Smith v. Stafford*, 189 P.3d 1065, 1071 (Alaska 2008).

[92] *Lane v. City & Borough of Juneau*, 421 P.3d 83, 91 (Alaska 2018) (quoting *Aspen Exploration Corp. v. Sheffield*, 739 P.2d 150, 158 (Alaska 1987)).

[93] *Id.* at 92.  The parties rely on *Russell ex rel. J.N. v. Virg-In*, 258 P.3d 795, 809 (Alaska 2011) for the proposition that "the Borough is entitled to qualified immunity to the same extent as its employees."  Docket 86 at 49 & n.132; *see* Docket 32-1 at 43 & n.207.  But, in *Lane*, the Alaska Supreme Court "disavow[ed] the[] implication [from prior cases] that when individual municipal employees act with discretion, the municipality is vicariously immune." *Lane*, 421 P.3d at 92.

[94] *Lane*, 421 P.3d at 92.

[95] *Id.* at 93.

[96] *Smith*, 189 P.3d at 1074.

**DISCUSSION**

## I. Motions for Summary Judgment

### a. 42 U.S.C. § 1983 Claim – First Amendment Retaliation Claim

As a threshold matter, the Court addresses Kerr's contention that Defendants only seek summary judgment on one of three First Amendment theories alleged in the Complaint; specifically, while Defendants address Kerr's retaliation claim based on his November 2021 statement to the Assembly, Kerr asserts they do not address his claims based on the photo with Donald Trump Jr. that Kerr posted on Facebook in December 2020 or the prior restraints placed on Kerr's speech by Giesbrecht in June and July 2022.[97]

Defendants respond that the claims based on the photo and prior restraints are new theories of liability and the "operative complaint does not put the Defendants on notice of either of these . . . theories."[98] Defendants also maintain that "Kerr did not separately plead a *Monell* claim, or provide sufficient details from which *Monell* liability could be ascertained."[99] In reply, Kerr counters that Defendants were on notice of all three claims.[100]

---

[97] Docket 86 at 31-32.

[98] Docket 105 at 2.

[99] Docket 105 at 6.

[100] Docket 116 at 1.

Turning first to the First Amendment claim based on the Facebook photo, Kerr seems to acknowledge that the photo is mentioned only once in his Complaint, but maintains that because Defendants asked for the production of the photograph and inquired about the photograph during Kerr's deposition, Defendants "have always known that the Trump photograph was an integral part of Plaintiff's First Amendment claims."[101]

The Court agrees with Defendants that a fair reading of the Complaint would not put them on notice that Kerr was bringing a distinct First Amendment retaliation claim for the photo. The first ten paragraphs of the Complaint relate to the November 2021 statement, without mention of the photo.[102] In the next paragraph, the Complaint alleges that "Kerr's speech was a substantial or motivating factor in adverse employment actions thereafter taken by the defendants against Mr. Kerr as a public employee."[103] The mention of the photo is in the context of the allegedly adverse actions taken against Kerr after he made his November 2021 statement, which included the quoted sentence from his performance review. The Court finds

---

[101] Docket 116 at 3-4 (citing Docket 1-2 at 152, ¶ 14 ("On January 14, 2022, Mr. Kerr received his performance appraisal for the review period of January 1, 2021 to December 31, 2021. The performance appraisal was signed by Giesbrecht. Mr. Kerr received a negative evaluation for his 'political decision making.' The evaluation stated that 'Jim has had some missteps regarding communication both in person and on social media. The COVID discussion with the Assembly was inappropriate, and the publishing of the airport picture with no mask, during the pandemic was ill advised.'")).

[102] Docket 1-2 at 148-51.

[103] Docket 1-2 at 151, ¶ 11.

that Kerr has inadequately pled a First Amendment claim seeking damages based on his publication of the photo in December 2020.[104]  Because Kerr "may not effectively amend [his] Complaint by raising a new theory . . . in [his] response to a motion for summary judgment," the Court will not consider a separate First Amendment claim for damages based on the photo.[105]

Next, the Court addresses the First Amendment claim based on restrictions placed on Kerr's speech by Giesbrecht in the summer of 2022.  In Kerr's view, he adequately alleges a prior restraint claim, pointing to allegations in the Complaint that "[a]fter issuing the false and misleading press release [in June 2022], the defendants *continued* to infringe on Mr. Kerr's free speech rights."[106]  Specifically, the Complaint alleges that on June 28, 2022, Giesbrecht told Kerr not to "respond in a negative fashion" to any negative comments by Meucci or Kensinger or any criticism in the KFSK story;[107] on July 5, 2022, Giesbrecht instructed Kerr via email that "[a]ll inquiries from or discussions with the public or local press regarding [the

---

[104] As a further indication that Kerr's claims are limited to his November 2021 statement and purported prior restraints, the portion of the Complaint alleging a claim under the Alaska Constitution focuses on his "speech to the Borough Assembly on November 17, 2021, and his subsequent communications with the media about the Borough's investigation."  Docket 1-2 at 162, ¶ 51.

[105] *La Asociacion De Trabajadores De Lake v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010).

[106] Docket 116 at 5 (quoting Docket 1-2 at 156) (emphasis in original).

[107] Docket 1-2 at 156, ¶ 26.

investigation] should be directed to me"[108]; and, on July 7, 2022, Giesbrecht emailed Kerr a "Policy Guideline" requiring Kerr to "present to [Giesbrecht], in writing, any public statement [Kerr] wish[ed] to make to the Assembly, other Board and Commission, or the media (excluding standard press releases addressing arrests or police criminal investigations with the Borough)."[109]

The Court finds that the Complaint adequately alleges that the policies instituted by Giesbrecht in June and July 2022 were unconstitutional prior restraints on Kerr's First Amendment rights.[110] While the prior restraints appear to underlie Kerr's claim under the Alaska Constitution and Kerr cites to Alaska law in the Complaint, the facts alleged also adequately put Defendants on notice of a First Amendment prior restraint claim under federal law.[111] Therefore, Kerr can proceed with his prior restraint damages claim under federal law. However, this order does not decide that claim as Defendants' motions did not address it.

---

[108] Docket 1-2 at 157, ¶ 29.

[109] Docket 1-2 at 158, ¶ 33.

[110] For a First Amendment prior restraint claim, a plaintiff must show that the challenged restriction prohibits speech made by the plaintiff in his capacity as a citizen on a matter of public concern. *See Barone v. City of Springfield*, 902 F.3d 1091, 1102-04 (9th Cir. 2018). If he does so, then the government employer must show that it "'had an adequate justification' for implementing the" restriction. *Id.* at 1104-05 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)); *see id.* at 1102, 1106 (holding that a policy prohibiting public employees from "speak[ing] or writ[ing] anything of a disparaging or negative manner related to the Department/Organization/City of Springfield or its Employees" was an unconstitutional prior restraint).

[111] *Sagana v. Tenorio*, 384 F.3d 731, 736-37 (9th Cir. 2004) ("A party need not plead specific legal theories in the complaint, so long as the other side receives notice as to what is at issue in the case."); *see also Cabrera v. Martin*, 973 F.2d 735, 745 (9th Cir. 1992) (stating that pleading facts underlying a § 1983 claim without naming the actual statute is sufficient).

Case No. 1:23-cv-00008-SLG, *Kerr v. Borough of Petersburg, et al.*
Order on All Pending Motions
Page 24 of 67

Case 1:23-cv-00008-SLG     Document 118     Filed 03/31/25     Page 24 of 67

As to a *Monell* claim, Kerr maintains that the Borough is liable for Giesbrecht's June and July 2022 written policies and "other retaliatory actions alleged in Plaintiff's complaint" because the policies were expressly adopted official policy of the Borough and Giesbrecht is a final policymaker for the Borough.[112]  Further, Kerr points out that he expressly amended his Complaint to add the *Monell* claim.[113]  The Court finds that the operative Complaint adequately alleges a *Monell* claim.[114]

\* \* \*

The Court now turns to the merits of Defendants' motions for summary judgment on Kerr's First Amendment claims.  Generally, a claim by a government employee that his employer took an adverse action against the employee because of his speech is analyzed under the test set forth in *Pickering v. Board of Education*. *Pickering* requires a trial court to "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs

---

[112] Docket 116 at 2-3 (citing Docket 1-2 at 156-58, 163, ¶¶ 26-30, 33-34); Docket 1-2 at 163, ¶ 60 ("As the chief administrative officer and head of the administrative branch of the borough government, with direct supervisory control over the chief of the police department, Defendant Giesbrecht's edicts or acts represent the official policy of the Borough of Petersburg.").

[113] Docket 116 at 2 (citing Docket 1-2 at 48, 92-93 & n.14).

[114] *Sagana v. Tenorio*, 384 F.3d 731, 736-37 (9th Cir. 2004) ("A party need not plead specific legal theories in the complaint, so long as the other side receives notice as to what is at issue in the case."); *see also Cabrera v. Martin*, 973 F.2d 735, 745 (9th Cir. 1992) (stating that pleading facts underlying a § 1983 claim without naming the actual statute is sufficient).

through its employees."[115] "The Supreme Court later carved out an exception to this general rule": "a public official who is a 'policymaker' may be fired for political reasons without offending the United States Constitution."[116] "Because such dismissals and demotions potentially infringe upon constitutional rights, [the Ninth Circuit has] held that the exception is 'narrow' and should be applied with caution."[117]

### i. Policymaker Exception

If a plaintiff "falls within the 'policymaker' exception to the First Amendment, . . . [he] cannot avail himself of any constitutional protection against his demotion on the basis of his political speech."[118] Under the Supreme Court's precedent, "a public employee need not literally make policy in order to fit within the . . . policymaker exception. Rather, an employer may fire a public employee for purely political reasons if the employer can demonstrate that political considerations are 'appropriate requirements for the effective performance' of the job."[119] This policymaker exception was created "so that 'representative government not be

---

[115] *Fazio v. City & Cnty. of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997) (alteration in original) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

[116] *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347 (1976)).

[117] *Hunt v. Cnty. of Orange*, 672 F.3d 606, 611 (9th Cir. 2012) (quoting *DiRuzza v. Cnty. of Tehama*, 206 F.3d 1304, 1308 (9th Cir. 2000)).

[118] *Id.*

[119] *Fazio*, 125 F.3d at 1332 (emphasis omitted) (quoting *Branti v. Finkel*, 445 U.S. 507, 518 (1980)).

undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate.'"[120]

In *Fazio*, the Ninth Circuit held that an Assistant District Attorney with the title "Head Attorney" who was terminated after he decided to run against the District Attorney in an upcoming election was a policymaker.[121]   Therefore, the Ninth Circuit held that there was no First Amendment violation as a matter of law.[122]   In *Fazio*, the Ninth Circuit articulated nine non-exclusive factors to be considered when determining whether a job is a policymaker position: "vague or broad responsibilities, relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders."[123]   "[T]he most critical factor [is] influence over programs."[124]   "The essential inquiry in determining whether the *Elrod* 'policymaker' exception applies is not whether the nine *Fazio* factors mechanically apply, or 'whether the label "policy-maker" or "confidential" fits a particular position; rather, the question is whether the hiring authority can demonstrate that party

---

[120] *Hunt*, 672 F.3d at 611 (quoting *Elrod*, 427 U.S. at 367).

[121] *Fazio*, 125 F.3d at 1330, 1334.

[122] *Id.* at 1334.

[123] *Id.* at 1334 n.5.

[124] *Bardzik v. Cnty. of Orange*, 635 F.3d 1138, 1146 (9th Cir. 2011) (internal quotation marks and citation omitted).

affiliation is an appropriate requirement for the effective performance of the public office involved.'"[125]  And the "rule applies not merely to party affiliation, but more broadly to political beliefs, expression, and support."[126]

In the Ninth Circuit, "[t]he actual, not the possible, duties of an individual employee determine whether political loyalty is appropriate for the effective performance of her job."[127]  "[D]etermining the particular duties of a position is a factual question, while determining whether those duties ultimately make that position a policymaking or confidential [position] is a question of law."[128]  The "burden on the government to prove that political fidelity was a necessary requirement of [an employee's] job" is "high."[129]

Kerr maintains that his job is "nonpartisan and nonpolitical."[130]  He maintains that it would be impossible to have political allegiance to the Assembly, which is nonpartisan and is comprised of members with differing political beliefs and policy

---

[125] *Hunt*, 672 F.3d at 611-12 (quoting *Branti*, 445 U.S. at 518).

[126] *Hobler v. Brueher*, 325 F.3d 1145, 1149 (9th Cir. 2003)

[127] *DiRuzza*, 206 F.3d at 1310.

[128] *Hobler*, 325 F.3d at 1150 (quoting *Walker v. City of Lakewood*, 272 F.3d 1114, 1132 (9th Cir. 2001)); *Bardzik*, 635 F.3d at 1144 ("[W]hether the particular duties of [plaintiff's] position . . . made him a policymaker is a question of law for the district court . . . ."); *Bakalar v. Dunleavy*, 580 F. Supp. 3d 667, 680 (D. Alaska 2022) ("The nature and extent of Plaintiff's duties are not disputed, and therefore whether her job was a policymaking one is a question of law amenable to summary judgment.").

[129] *Hunt*, 672 F.3d at 616.

[130] Docket 86 at 16.

goals.[131] Kerr contends that his job "is divorced from political considerations or allegiances" because he was hired by and reports to Giesbrecht and the Assembly is not within his chain of command.[132] Further, Kerr notes that he cannot be removed from his job because of his political opinions or affiliations.[133] And Kerr points out that "Giesbrecht testified that 'there's probably two positions in the Borough that have to be nonpolitical': the Police Chief and the Borough Manager."[134]

Defendants disagree that Kerr's role is nonpartisan, maintaining that "the Police Chief's role in implementing law enforcement policy promulgated by the Borough Assembly . . . requires loyalty to, and deference to, the Assembly and its partisan preferences."[135] Defendants rely on *Summers v. City of McCall*, a district court case finding that a police chief was a policymaker after considering each of the *Fazio* factors.[136] Kerr distinguishes that case from his, contending that "[i]n *Summers,* the elected City Council was directly in the police chief's chain of

---

[131] Docket 86 at 16-17.

[132] Docket 86 at 17.

[133] Docket 86 at 18 (citing Petersburg, Alaska, Charter § 19.17 (2025) ("A person may not be appointed to or removed from borough office or in any way favored or discriminated against with respect to a borough position or borough employment . . . because of the person's political opinions or affiliations.").

[134] Docket 86 at 19 (quoting Docket 86-2 at 38 (Giesbrecht. Dep.)).

[135] Docket 75 at 65.

[136] Docket 75 at 65 (quoting 84 F. Supp. 3d 1126, 1158 (D. Idaho 2015)).

command and had authority to terminate him at will."[137]  He maintains that "[h]ere, the Borough Assembly cannot recommend, direct, or request Plaintiff's removal; the Assembly cannot give Plaintiff orders or directives; and Plaintiff explicitly cannot be fired for political reasons."[138]

The Court agrees with Kerr that *Summers* is distinguishable in that under the Petersburg Code, the Borough Manager supervises the Police Chief, the Police Chief can only be terminated by the Borough Manager for cause, and the Assembly is prohibited by the code from giving orders on administrative matters directly to any subordinate of the Borough Manager.[139]  Therefore, *Summers* does not establish that Kerr was a policymaker as a matter of law.  Nonetheless, like Summers's duties, the Police Chief here "implement[s] . . . the policies and directives of the [Assembly]" and the position "demand[s] a certain level of allegiance and affiliation to the [Assembly] as well as the [Borough] Manager."[140]

---

[137] Docket 86 at 21-22.

[138] Docket 86 at 22.

[139] *See* Petersburg, Alaska, Mun. Code § 3.34.020(A) (2025) ("The police chief may be terminated by the manager only for just cause."); Petersburg, Alaska, Charter § 19.17 (2025) ("A person may not be appointed to or removed from borough office or in any way favored or discriminated against with respect to a borough position or borough employment . . . because of the person's political opinions or affiliations."); Petersburg, Alaska, Mun. Code § 3.08.050 (2025) ("Neither the borough assembly nor any of its members may recommend, direct or request the appointment or removal of any person to or from borough office or employment except as may be otherwise provided in the borough Charter or this Code. The assembly and its individual members shall deal with the administrative service of the municipality solely through the borough manager. Neither the assembly nor its individual members may give orders on administrative matters to any subordinate of the borough manager, either publicly or privately.").

[140] *Summers*, 84 F. Supp. 3d at 1158.

Defendants also rely on *Bardzik v. County of Orange* to show that Kerr is a policymaker as a matter of law.[141]   In that case, Bardzik was a lieutenant in the Orange County Sheriff's Department.   He sued the Sheriff after the Sheriff transferred Bardzik out of his position as Reserve Division Commander to "an undesirable post at Court Operations" because Bardzik supported the Sheriff's opponent in a recent election.[142]   The Sheriff had selected Bardzik for the Reserve Division Commander position because he had the skills required to "get [the Division] back on track."[143]   The Sheriff told Bardzik to "clean it up and bring it back to respectability."[144]   For Bardzik's first year as Reserve Division Commander, Bardzik worked with the Sheriff often, meeting with him a few times a week to a few times a month, and because his supervisor was often absent, he reported to the Sheriff.[145]   Bardzik ensured that the Reserve Division had the necessary expertise, implemented a decentralization program, and reformed the promotion system to move away from favoritism based promotions.[146]   The Sheriff argued that Bardzik was a policymaker because as Reserve Division Commander he

---

[141] Docket 32-1 at 29-32 & n.148 (citing 635 F.3d at 1147).

[142] *Bardzik*, 635 F.3d at 1140-41.

[143] *Id.* at 1142.

[144] *Id.* at 1141.

[145] *Id.* at 1142.

[146] *Id.*

oversaw 600 reserve officers and proposed and implemented large policy changes.[147]

The Ninth Circuit agreed that Bardzik was a policymaker as a matter of law when he was the Reserve Division Commander, although it observed that it was a "close question."[148] The Ninth Circuit analyzed the *Fazio* factors and held that five factors favored finding that Bardzik was a policymaker. First, Bardzik's responsibilities were broad and vague, and he admitted that he was effectively running the Reserves.[149] Next, the evidence showed that Bardzik influenced many Reserve Division programs—the most critical factor—even though he could not unilaterally create or implement programs without input from the Sheriff.[150] Bardzik also had frequent and meaningful contact with the Sheriff, had particular technical competence qualifying him to serve as Reserve Division Commander, and had the power to control others as he supervised two sergeants, four clerical staff, and 600 Reserve members, notwithstanding the fact that Bardzik sent "reviews and promotion recommendations . . . up the chain of command."[151] The Ninth Circuit held that another factor weighed in favor of finding that Bardzik was a policymaker:

---

[147] *Id.* at 1141.

[148] *Id.* at 1146.

[149] *Id.*

[150] *Id.* at 1147.

[151] *Id.* at 1147-48.

he "actively sought to undermine the Sheriff's policies" and "was in a position to thwart the Sheriff's agenda."[152]   The Ninth Circuit held that Bardzik was a policymaker and therefore the Sheriff did not violate the First Amendment by demoting him.[153]

The Court finds that *Bardzik* does not establish that Kerr was a policymaker as a matter of law because there are meaningful distinctions between Bardzik's job as the Reserve Division Commander and Kerr's role as Police Chief.   For example, Bardzik worked directly and frequently with the elected official, the Sheriff.   Here, viewing the evidence in the light most favorable to Kerr, Kerr does not work frequently with the Assembly and any such interactions are indirect, through Giesbrecht.   Additionally, evidence in the record in *Bardzik* showed that Bardzik created and implemented several Reserve Division programs; here, there is no evidence in the record that Kerr has created or implemented any police department programs.

Defendants next assert that, based on the Police Chief's formal job description, the *Fazio* factors show that Kerr is a policymaker as a matter of law.[154]

---

[152] *Id.* at 1148. The four remaining *Fazio* factors weighed against finding that Bardzik was a policymaker: there was no evidence that Bardzik had a relatively high salary; Bardzik did not have the authority to speak for the Sheriff; there was no evidence the public knew about Bardzik; and the "responsiveness to partisan politics and political leaders" factor was inconclusive and therefore the Sheriff did not carry his burden as to that factor.   *Id.* at 1146.

[153] *Id.* at 1141, 1149.

[154] Docket 75 at 57-66; Docket 32-1 at 24-31; Docket 105 at 11-15.   In asserting that the Police Chief job description alone is enough to establish that Kerr was a policymaker, Defendants rely

Kerr disagrees, contending that the Police Chief job description cannot establish that he was a policymaker because the Court must analyze Kerr's duties "actually performed" and that disputes of fact remain as to the scope and content of his job duties as actually performed.[155] Defendants reply that Kerr incorrectly reads *DiRuzza* and "Kerr's testimony about the 'actual' work he has performed as the Borough Police Chief is irrelevant to the policymaker analysis" because "the job description for the Police Chief position and his employment contract establish policymaker status."[156]

The Court finds that Kerr's status as a policymaker cannot be decided solely based on his job description and employment contract, particularly where the parties dispute the scope of Kerr's actual duties. In *DiRuzza*, a deputy sheriff alleged that she was improperly fired after supporting an opponent of one of the defendants in the election for sheriff.[157] The district court relied "upon three cases from other circuits holding that deputy sheriffs are policymakers" to find that deputy

---

largely on out of circuit case law. Docket 105 at 11-15.

[155] Docket 86 at 13 (quoting *DiRuzza*, 206 F.3d at 1310). Kerr also cites *Garcetti v. Ceballos*, 547 U.S. 410, 424–25 (2006) in arguing that "'[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform'" and are "'neither necessary nor sufficient to demonstrating that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.'" Defendants distinguish *Garcetti* as discussing "the application of an employee's job description to the issue of whether a public employee spoke as a private citizen or pursuant to their official responsibilities" and not applicable to the policymaker analysis. Docket 105 at 13.

[156] Docket 105 at 12-14.

[157] *DiRuzza*, 206 F.3d at 1306.

sheriffs in California are policymakers.[158]  The district court therefore granted the

defendants summary judgment on the plaintiff's First Amendment claim.[159]  The

Ninth Circuit reversed and "remand[ed] for a determination of whether her actual

duties were those of a policymaker" because the defendants had "failed to show

as a matter of law that DiRuzza was a policymaker."[160]  The Ninth Circuit held that

the defendants' argument "that a deputy sheriff *may* act as a policymaker" was

"beside the point" because "[t]he actual, not the possible, duties of an individual

employee determine whether political loyalty is appropriate for the effective

performance of her job."[161]

The Court reads *DiRuzza* to require more than a job title or a job description

for a government defendant to meet its burden to establish as a matter of law that

the "narrow" policymaker exception applies.[162]  Instead, the Court will view the

---

[158] *Id.* at 1307.

[159] *Id.*

[160] *Id.* at 1306.

[161] *Id.* at 1310 (emphasis in original).

[162] *Id.* at 1306, 1308; *see also Hunt*, 672 F.3d at 609-12.  In *Hunt*, the plaintiff—the Chief of Police Services for San Clemente and a lieutenant in the Orange County Sheriff's Department—campaigned against the defendant—the incumbent sheriff—during an election.  672 F.3d at 609. After the defendant won reelection as sheriff, he placed the plaintiff on administrative leave. *Id.* at 609-10. The plaintiff sued, alleging a violation of his First Amendment rights. *Id.* at 610. "Because the question of whether [the plaintiff's] position required political loyalty was critical to whether he fell into the policymaker liability exception to the First Amendment, the parties tried the nature of [the plaintiff's] responsibilities and . . . position to a jury."  *Id.*  The district court asked the jury to answer 37 special interrogatories related to the plaintiff's position. *Id.*  Based on the jury's answers, the district court found that the plaintiff was a policymaker and therefore his demotion did not violate the First Amendment.  *Id.* at 610-11.  On appeal, the Ninth Circuit analyzed *de novo* whether the plaintiff was a policymaker. *Id.* at 611.  The Ninth Circuit reversed

---

evidence in Kerr's favor and determine whether the policymaker exception applies as a matter of law by considering the *Fazio* factors.

## 1. Vague and Broad Responsibilities

Defendants refer the Court to several portions of the Police Chief job description in asserting that Kerr's job duties are "broad and vague."[163]  They also maintain that Kerr's testimony, that he "run[s] the police department and dispatch and jail" and "oversee[s] all of the officers," which includes "[c]ommunicating with officers . . . [c]hecking in on dispatch, reviewing calls . . . [t]alking with the public . . . [and] a whole slew of [other duties]," demonstrates that his job duties are vague and broad.[164]

Kerr again asserts that his "job description is not an accurate reflection of the job actually performed," providing several examples.[165]  Giesbrecht acknowledged that the Police Chief job description did not accurately describe Kerr's actual duties.[166]  For instance, the job description "states the Police Chief

---

the district court, holding that "the record fail[ed] to establish that [the plaintiff's] party affiliation or political outlook were relevant to the effective discharge of his professional duties."  *Id.* at 612.  The Ninth Circuit's conclusion was based on the jury's findings that the trust and confidence of the employee's supervisors was not required for Hunt to perform his job and that the political statements that he made did not cause and could not have reasonably been predicted to cause a disruption in the efficient operation of the police department.  *Id.*

[163] Docket 75 at 58-59 (citing Docket 1-1 at 54-55).

[164] Docket 75 at 59 (quoting Docket 75-3 at 2 (Kerr Dep.)).

[165] Docket 86 at 22.

[166] Docket 86-2 at 39 (Giesbrecht Dep.).

'[p]rioritizes and allocates available resources,' when in reality, Plaintiff has limited discretion and control over setting the department's budget and priorities."[167]  Kerr also characterizes his role, when compared to police chiefs in larger cities or elected sheriffs, as "relatively simple: he supervises a small team of 13–15 staff under established department guidelines."[168]

Although a considerably smaller operation than the Reserve Division in *Bardzik*, Kerr's responsibilities as Police Chief, like the Reserve Division Commander's responsibilities, are broad and vague.  Kerr admitted that he effectively runs the police department and performs what he described as a "whole slew" of duties.[169]  The Court finds that, even when viewing the evidence in the light most favorable to Kerr, this *Fazio* factor supports finding that Kerr is a policymaker.

## 2.  Relative Pay

In November 2021, Kerr was the third-highest paid employee in the Borough, with only the Borough Manager and Utility Director earning more.[170]  Kerr

---

[167] Docket 86 at 22 (citing Docket 86-2 at 52-57 (Giesbrecht Dep.); Docket 75-3 at 2-3 (Kerr Dep.)).

[168] Docket 86 at 22-23 (citing Docket 86-1 at ¶¶ 2, 5-6 (Kerr Decl.)).

[169] Docket 75-3 at 1 (Kerr Dep.); *see also Bardzik*, 635 F.3d at 1146.

[170] Docket 32-5 (showing a Police Chief annual salary, as of July 1, 2021, of $100,877.18, with the Borough Manager and the Utility Director earning $121,000.00 and $118.688.83, respectively).  The lowest salaried department head earned $63,000 that year.  With "longevity increases," by July 13, 2023, the Police Chief was the fourth-highest paid Borough employee. Docket 32-5.

maintains that the salaries among department heads in the Borough are substantially similar and reflect compensation related to years of tenure at the Borough rather than inhering in the particular job.[171]  Viewing the evidence in the light most favorable to Kerr, the salary evidence in the record indicates that Kerr is one of the highest paid Borough employees.[172]  On the limited salary record before the Court, the Court finds that, even when viewing the evidence in the light most favorable to Kerr, this *Fazio* factor supports finding that Kerr is a policymaker at the summary judgment stage.

### 3.  Technical Competence

In addition to the Police Chief job description, Defendants maintain that Kerr's technical competence renders him a policymaker as a matter of law.[173]  Kerr does not dispute that he has the technical competence required to do his job, but asserts that technical competence is required of "any rank-and-file law enforcement officer and does not reflect a need for political loyalty."[174]

---

[171] Docket 86 at 23 (citing Docket 32-5).

[172] *Cf. Bardzik*, 635 F.3d at 1146 (holding that the relative pay *Fazio* factor weighed against finding the Reserve Division Commander was a policymaker because there was "no evidence to show that Bardzik had a relatively high salary compared to other employees in the Department. Bardzik was only paid $116,000 a year, whereas an assistant sheriff could earn as much as $260,000").

[173] *See* Docket 32-1 at 26-31 (citing Docket 1-1 at 54-55); Docket 75 at 60 (citing Docket 75-3 (Kerr Dep.))*; see also* Docket 1-2 at 149, ¶ 2 ("Plaintiff James Kerr has dedicated a large part of his life to working and serving the Borough of Petersburg. He joined the Petersburg Police Department back in 2013 and, through exemplary service and dedication, was made Chief of the Department in July 2018.").

[174] Docket 86 at 23.

Kerr is not a rank-and-file police officer. His role as Police Chief requires technical competence beyond that required of other police officers. Specifically, it requires competence in supervising the other officers and running the police department. And Giesbrecht hired Kerr for the Police Chief position based on his particular skills and attributes.[175] The Court finds that this *Fazio* factor supports finding that Kerr is a policymaker.[176]

### 4. Power to Control Others

Defendants maintain that Kerr "has substantial power to control others."[177] They point to Kerr's job description, which provides that he supervises the police department; directs and oversees police department services; "provides for the selection, training, professional development, and work evaluation of police department staff"; "provides policy guidance and interpretation to police department staff"; and "authorizes department employee discipline with the input and/or approval of the Borough Attorney and Human Resources."[178]

---

[175] Docket 86-2 at 37-38 (Giesbrecht Dep.) ("Jim was very personable. . . . He had all the right skills, for the most part. Both the exiting chief and the exiting captain did not think so. They felt Jim was too green, that he didn't have enough leadership experience. I acknowledged the fact that he did not have a lot of command experience at the time, but I thought some of the other positives were worth it. And I made it very clear, you know, that, you know, we would do what we could to mentor him on those kind of things and make that available. And I think across the board . . . the community really endorsed Jim.").

[176] *Cf. Walker*, 272 F.3d at 1133 (finding that plaintiff "was hired particularly for [his] technical competence" and therefore the technical competence *Fazio* factor supported finding plaintiff was a policymaker).

[177] Docket 32-1 at 27.

[178] Docket 32-1 at 27-28 (citing Docket 1-1 at 54).

Kerr seems to agree that he can hire and discipline department staff subject to Giesbrecht's approval.[179]  And Giesbrecht "do[es] not decide who [is hired], just whether a position would get filled or not" as a "budgetary issue."[180]  However, Kerr cannot terminate employees without the approval of the Manager, Human Resources, and the Borough Attorney; a pretermination hearing is also required.[181]

Viewing the evidence in the light most favorable to Kerr, Kerr does not have unilateral or final authority to control the hiring, discipline, or termination of police department employees.  However, like in *Bardzik* where the Ninth Circuit held that this *Fazio* factor supported finding that the plaintiff was a policymaker, Kerr can recommend hiring, disciplining, and terminating department staff, even though those actions have to go "up the chain of command" to others.[182]  And while "merely being a supervisor/administrator . . . is not sufficient to show that political affiliation is an appropriate requirement for the job in question," the Court finds that Kerr's power to control others goes beyond mere supervision, such that, even

---

[179] Docket 86-1 at ¶¶ 3-4 (Kerr Decl.); *see also* Petersburg, Alaska, Mun. Code § 3.34.020(C) (2025) ("The police chief may select personnel to serve as employees of the department but all such appointments and the number thereof shall require prior approval of the manager.").

[180] Docket 86-2 at 41 (Giesbrecht Dep.)

[181] Docket 86-2 at 42 (Giesbrecht Dep.)

[182] *Bardzik,* 635 F.3d at 1148; Docket 86-1 at ¶¶ 3-4 (Kerr Decl.); Petersburg, Alaska, Mun. Code § 3.34.020(C) (2025) ("The police chief may select personnel to serve as employees of the department but all such appointments and the number thereof shall require prior approval of the manager."); Docket 86-2 at 41-42 (Giesbrecht Dep.).  *Cf. Hunt*, 672 F.3d at 614 ("Hunt's power to control others, another *Fazio* factor, was severely limited" because "Hunt lacked any power to hire or promote the officers that worked under him in San Clemente.").

when viewing the evidence in the light most favorable to Kerr, this *Fazio* factor provides some support for a finding that Kerr is a policymaker at the summary judgment stage.[183]

### 5. Authority to Speak for Policymakers

As to whether Kerr has authority to speak in the name of Borough policymakers, Defendants maintain that Kerr has such authority because his job description provides that he "represents the department and the Borough in meetings with the members of the Borough Assembly, members of boards and commissions, various government agencies, other law enforcement agencies, and a variety of public and private organizations," and "is also the police department's primary liaison with the media."[184]

However, Kerr testified that, while he issues press releases on behalf of the police department for "routine police matters such as arrests, updates on criminal investigations, and public safety announcements," he "very rarely speak[s] on behalf of the Department."[185]  Kerr only recalled three prior occasions where he spoke to governmental entities on behalf of the police department, and Giesbrecht had preapproved his statements in each of those cases.[186]

---

[183] *Hunt*, 672 F.3d at 614 (internal quotation marks and citation omitted).

[184] Docket 32-1 at 28 (quoting Docket 1-1 at 55).

[185] Docket 86-1 at ¶ 7 (Kerr Decl).

[186] Docket 86-1 at ¶ 7 (Kerr Decl).

Viewing the evidence in the light most favorable to Kerr, his authority to speak on behalf of the Borough is largely limited to routine police matters and on the rare occasion he speaks on other topics, his remarks are reviewed by Giesbrecht.  Therefore, the Court finds that this *Fazio* factor weighs against finding that Kerr is a policymaker at the summary judgment stage.

### 6.  Public Perception

Defendants maintain that Kerr is "highly visible and well-known in the small community of Petersburg," and that his job requires him to "be willing to engage with the public and be seen and acknowledged as easily approachable by the community."[187]  Kerr acknowledges that he is a public figure and that he represents the police department in a small community.  But he maintains that "a reasonable citizen would understand that he was not appointed by an elected official, does not report to the Assembly, and is tasked with neutrally carrying out the law."[188]  Viewing the evidence in the light most favorable to Kerr, the Court finds that this *Fazio* factor weighs against finding that Kerr is a policymaker.

### 7.  Influence on Programs

Defendants contend that Kerr "provid[es] administrative direction" and "develops and directs the implementation of goals, objectives, policies,

---

[187] Docket 32-1 at 29; Docket 75 at 62 (quoting Docket 1-1 at 55).

[188] Docket 86 at 25.  *See Hunt*, 672 F.3d at 614 (holding that, while the public perception factor favored finding that the plaintiff was a policymaker, the plaintiff's interactions with "politicians and [the] public are insufficient to elevate his administrative role into a political role").

procedures, and work standards for the police department."[189]   Defendants maintain that *Bardzik* shows that "Kerr is a policymaker by virtue of his broad discretion to implement Borough law enforcement programs."[190]  As noted above, in that case, the plaintiff Reserve Division Commander performed an audit of the division, proposed a reorganization, and reformed the promotion system for the Reserve's officers.[191]  The Ninth Circuit held that the evidence established that Bardzik influenced many division programs—the most critical factor—even though he could not unilaterally create or implement programs without input from the Sheriff.[192]

Here, Defendants have not provided any evidence of programs Kerr has influenced, changed, or implemented.  Kerr testified that he does not have the authority to unilaterally alter police department policies or procedures because any changes must be approved by the Borough Manager and/or Borough Attorney.[193] He also testified that he has "never designed or implemented programs for the Department" and that, if he did, he would need "approval from the Borough Manager."[194]   Further, evidence in the record suggests that Kerr enforces

---

[189] Docket 32-1 at 29.

[190] Docket 32-1 at 29-30 & n.148 (citing 635 F.3d at 1147).

[191] *Bardzik*, 635 F.3d at 1142.

[192] *Id.* at 1146-47.

[193] Docket 86-1 at ¶ 5 (Kerr Decl).

[194] Docket 86-1 at ¶ 6 (Kerr Decl).

Petersburg law at the direction of Giesbrecht and the Assembly.[195]  Viewing the evidence in the light most favorable to Kerr, the Court finds that this *Fazio* factor—the factor that the Ninth Circuit has identified as "the most critical"—weighs against finding that Kerr is a policymaker.[196]

### 8. Contact with Elected Officials

To show that Kerr frequently contacts elected officials as part of his job, Defendants point to the Police Chief job description and Kerr's testimony that he regularly attends Assembly meetings.[197]  However, Giesbrecht testified that Kerr's attendance at Assembly meetings is not required unless Giesbrecht specifically asks him to attend.[198]  And Kerr testified that, before November 2021, his interactions with the Assembly were "almost always about the budget" and were "rare," as "the Assembly would speak with Giesbrecht and not [him]."[199]  Indeed, Petersburg Municipal Code § 3.08.050 provides that "[t]he assembly and its individual members shall deal with the administrative service of the municipality solely through the borough manager" and "[n]either the assembly nor its individual

---

[195] *See* Docket 86-3 at 1 (November 9, 2021, email from Giesbrecht to Meucci indicating that he "can force the Police to enforce the mask mandate"); Docket 32-11 at 2 (Kerr's November 17, 2021 statement to the Assembly stating, in part, "[i]f you want the mask mandate enforced, it will be enforced, but only until officers get hired by another police department.").

[196] *Bardzik*, 635 F.3d at 1146.

[197] Docket 75 at 61 n.268 ("Kerr admits that as part of the job he must address the Assembly on police matters, when asked.") (citing Docket 75-3 at 3 (Kerr Dep.)).

[198] Docket 86-2 at 44-45 (Giesbrecht Dep.).

[199] Docket 86-1 at ¶ 8 (Kerr Decl).

members may give orders on administrative matters to any subordinate of the borough manager, either publicly or privately."

The Court finds that Defendants have not shown that Kerr's contact with the Assembly as Police Chief was "frequent and meaningful."[200]  Viewing the evidence in the light most favorable to Kerr, this *Fazio* factor weighs against finding that Kerr is a policymaker.

### 9. Responsiveness to Partisan Politics and Political Leaders

Defendants maintain that "[a]s the police chief in charge of implementing and overseeing law enforcement services, Chief Kerr by necessity must be responsive to the Assembly and their policy directives."[201]  Defendants first rely on a Petersburg ordinance that permits Assembly Members to inquire into the conduct of any office, department, or agency, and to investigate municipal affairs.[202]  They maintain that "Kerr has a duty, as a department head and the Borough Police Chief, to be responsive to such inquiries."[203]  However, if having to respond to inquiries from the Assembly renders a Borough employee a policymaker, any employee who had to respond to an inquiry from the Assembly would be a policymaker.  This would be too broad an interpretation of the "narrow" policymaker exception.

---

[200] *Bardzik*, 635 F.3d at 1147.

[201] Docket 75 at 63.

[202] Docket 75 at 63-64 (citing Petersburg, Alaska, Mun. Code § 3.08.040(C) (2025)).

[203] Docket 75 at 64.

Defendants next contend that state court findings that Kerr is a "public official/public figure" and a "senior government official" support their claim that Kerr is a policymaker.[204] Those state court findings were upon consideration of Kerr's defamation claim and a separate suit involving a public records request and Kerr's privacy interests.[205] As Defendants acknowledge, that "analysis is decidedly different" from the "narrow" policymaker inquiry under the First Amendment.[206]

Defendants also maintain that, as Police Chief, Kerr "owes a certain level of allegiance and affiliation to the Borough Assembly and its policy preferences bearing on the Borough Police Department and law enforcement in the Borough."[207] They contend that, "[l]ike the police chief position at issue in *Summers*, the Borough Police Chief position requires broad oversight of law enforcement services in the Borough, providing policy recommendations, and implementation of the Assembly's law enforcement policies and priorities."[208]

Kerr responds that "[f]ollowing and enforcing existing law is not the same as being responsive to partisan politics or a political leader" and that there is "simply

---

[204] Docket 75 at 64-65 (citing Docket 75-17 (October 30, 2023, Alaska Superior Court order granting motion for *in camera* review and denying in part motion for summary judgment in *Koenigs v. Petersburg Borough, et al.*, Case No. 1PE-22-00046 CI)); *see* Docket 1-2 at 165 (August 14, 2023, Alaska Superior Court order granting Defendants' motion for partial summary judgment and finding that Kerr was a public official/public figure).

[205] Docket 75 at 64.

[206] Docket 75 at 64.

[207] Docket 75 at 65.

[208] Docket 105 at 19 (citing *Summers*, 84 F. Supp. 3d at 1157-58).

no way that allegiance to the politically diverse Assembly, who is outside Plaintiff's chain of command, could be an appropriate requirement of his job."[209]

The Court finds that, even when viewing the evidence in the light most favorable to Kerr, Kerr owes some duty of allegiance to the Borough Manager and to the Assembly as a whole. He must implement Petersburg law and supervise staff in implementing Borough policy on law enforcement. While Kerr may not be removed from his job because of his political opinions or affiliations and Giesbrecht testified that "there's probably two positions in the Borough that have to be . . . nonpolitical"—the Police Chief and the Borough Manager—Kerr is in a position to "thwart" the Assembly's agenda.[210] Kerr, as Police Chief, could "undercut" "'representative government . . . by tactics obstructing the implementation of policies of the . . . administration, policies presumably sanctioned by the electorate.'"[211] At its core, the Assembly and the Borough Manager are entitled to a police chief that they can be confident will supervise a police department that enforces its laws. The Court finds that this *Fazio* factor supports finding that Kerr is a policymaker.

---

[209] Docket 86 at 27.

[210] Docket 86-2 at 38 (Giesbrecht. Dep.); Petersburg, Alaska, Charter Art. 19, § 17 (2025) ("A person may not be appointed to or removed from borough office or in any way favored or discriminated against with respect to a borough position or borough employment . . . because of the person's political opinions or affiliations."); *Bardzik,* 635 F.3d at 1148.

[211] *Hunt*, 672 F.3d at 611 (quoting *Elrod*, 427 U.S. at 367).

Here, five *Fazio* factors warrant finding that Kerr was a policymaker: vague and broad responsibilities; relative pay; technical competence; power to control others; and responsiveness to partisan politics and political leaders. The remaining four *Fazio* factors do not support finding that Kerr was a policymaker: public perception; authority to speak for policymakers; influence over programs; and contact with elected officials.

In *Bardzik*, the Court held that the Reserve Division Commander was a policymaker as a matter of law because the evidence showed that five of the *Fazio* factors favored finding that Bardzik was a policymaker, including the most critical factor—influence over programs.[212] Here, while five *Fazio* factors support finding that Kerr was a policymaker, Defendants have not shown that Kerr has any influence on programs, the most critical factor. The Court therefore denies summary judgment to Defendants on Kerr's First Amendment retaliation claim. Through special interrogatories to a jury, the precise contours of Kerr's job duties can be ascertained, after which the Court can then determine whether the policymaker exception applies.

### Qualified Immunity Under § 1983

Defendants' Motion for Partial Summary Judgment Re: Qualified Immunity asserts that even if the Court did not find Kerr to be a policymaker, Giesbrecht

---

[212] *Bardzik*, 635 F.3d at 1146.

would still be entitled to qualified immunity on Kerr's § 1983 claim because Kerr's policymaker status was not clearly established at the time.

"[U]nder *Elrod* and *Branti*, decided by the Supreme Court in 1976 and 1980, and under Ninth Circuit case law decided prior to 1995, it was clearly established that a non-policymaking public employee in a sheriff's office is protected from retaliation for the exercise of First Amendment rights."[213] "[T]he critical question here is whether a reasonable official in [Giesbrecht's] position should have known that [Kerr] was not a policymaker whose political loyalty was important to the effective performance of his job" and therefore that Giesbrecht could not reprimand Kerr for his November 2021 statement at the Assembly meeting.[214] "If [Giesbrecht] 'could . . . have reasonably but mistakenly believed that his . . . conduct did not violate a clearly established constitutional right,' he is entitled to qualified immunity."[215] Kerr bears the burden of showing that Giesbrecht should have known that Kerr was not a policymaker.

In opposition to qualified immunity, Kerr relies on *Hunt v. County of Orange*, contending that "the close parallel of Hunt's duties to Plaintiff's, the Ninth Circuit's clear instruction that political loyalty is the main consideration, and the fact that

---

[213] *Hunt*, 672 F.3d at 615 (quoting *DiRuzza*, 206 F.3d at 1313).

[214] *Id.*

[215] *Id.* at 615-16 (quoting *Greene v. Camreta*, 588 F.3d 1011, 1031 (9th Cir. 2009)).

Plaintiff's job is decidedly *less* political than Hunt's would cause any reasonable official to understand that Plaintiff is not a policymaker."[216]

In *Hunt*, Michael Carona was elected for the third time as Orange County Sheriff.[217] William Hunt, the Chief of Police Services for the City of San Clemente and a lieutenant with the Orange County Sheriff's Department, had run against Carona in an election and made statements critical of Carona's job performance.[218] After Carona was re-elected, he placed Hunt on administrative leave and then demoted him.[219] Hunt sued Carona, alleging that those actions violated his First Amendment rights.[220] The case went to trial, and the district court asked the jury to answer special interrogatories related to Hunt's position.[221] Based on the jury's answers, the district court found that Hunt was a policymaker and therefore his demotion by Corona did not violate the First Amendment.[222]

On appeal, the Ninth Circuit reversed, holding that Hunt was not a policymaker.[223] The Court relied on the jury's findings that "neither Carona's, the

---

[216] Docket 86 at 29-30 (emphasis in original) (citing *Hunt*, 672 F.3d 606).

[217] *Hunt*, 672 F.3d at 609.

[218] *Id.*

[219] *Id.*

[220] *Id.*

[221] *Id.* at 610.

[222] *Id.*

[223] *Id.* at 614.

Captains', nor the Assistant Sheriffs' trust and confidence was necessary for Hunt to perform his job," and that "Hunt's political statements—which were the basis of his demotion—did not cause, and could not have been reasonably predicted to cause, a disruption in the efficient operation of the department."[224]

The Circuit Court also held that the *Fazio* factors suggested that Hunt was not a policymaker, as the jury found that

> Hunt did *not* have a vaguely worded job description; Hunt did *not* have authority to speak to the media without prior approval of higher-ranking officials; Hunt did *not* have policymaking authority over any area of policy; Hunt did *not* formulate, substantially influence, or substantially influence modifications to any department-wide policy; Hunt did *not* formulate or substantially influence plans to implement the broad goals of the OCSD department-wide; Hunt did *not* formulate policy that affected San Clemente; and Hunt did *not* exercise discretion in setting policy for the OCSD in San Clemente.[225]

Further, "Hunt lacked any power to hire or promote the officers that worked under him in San Clemente" and he had "limited and largely operational" authority "to impose discipline and manage deployments, but only within the contours of the department policy that was set by his superiors."[226]

Even though Hunt was not a policymaker, the Ninth Circuit held that Carona was entitled to qualified immunity because he "could have reasonably but mistakenly believed that Hunt's demotion was not unconstitutional, given the

---

[224] *Id.* at 612.

[225] *Id.* at 613-14 (emphases in original).

[226] *Id.* at 614.

unique nature of his job as Chief of Police Services for the City of San Clemente."[227]    The Court explained that "[e]ven if Carona engaged in the appropriate [policymaker] analysis and wrongly concluded that Hunt was a policymaker such that demoting him was constitutional, we cannot say that he acted objectively unreasonably in concluding he could demote Hunt without violating his constitutional rights."[228]

As shown above in the Court's analysis of the *Fazio* factors, the facts in this case differ too greatly from *Hunt* for that case to clearly establish that Kerr was not a policymaker.  While a case directly on point is not required to clearly establish a constitutional right, *Hunt* would not have put a reasonable official on notice that a police chief, who was promoted to that role specifically for his technical competence and had vague and broad job responsibilities, authority over police department employees beyond mere supervision, and owed some duty of allegiance to the Assembly as a whole, was not a policymaker.  Additionally, in the analysis above, the Court found that the *Fazio* factors are too closely balanced to find that Kerr is a policymaker as a matter of law.  Like in *Hunt*, here the Court "cannot say that [Giesbrecht] acted objectively unreasonably in concluding he could" reprimand Kerr for his statement to the Assembly.[229]

---

[227] *Id.* at 616.

[228] *Id.*

[229] *Id.*

Kerr also contends that "Giesbrecht and the Assembly actually knew that Plaintiff is not a policymaker."[230] However, "[t]he standard for qualified immunity is objective," and a government official's "subjective understanding of the constitutionality of his or her conduct is irrelevant."[231]

Defendants contend that "Kerr fails to cite a single decision holding that a municipal police chief position is not subject to the policymaker exception."[232] The Court agrees, and finds that Kerr has not met his burden to show that it was clearly established that Kerr was not a policymaker at the time Giesbrecht took the alleged adverse actions against Kerr for his statement to the Assembly in November 2021. Therefore, Giesbrecht is entitled to qualified immunity on Kerr's First Amendment retaliation claim.

### ii. *Pickering* Analysis

While the Court finds that Giesbrecht is entitled to qualified immunity on Kerr's First Amendment retaliation claim, the Borough could still be liable pursuant to *Monell* for Giesbrecht's acts if his conduct fails the test set forth in *Pickering Board of Education*. "Under the *Pickering* framework, it is the plaintiff's burden to establish that '(1) []he spoke on a matter of public concern; (2) []he spoke as a private citizen rather than a public employee; and (3) the relevant speech was a

---

[230] Docket 86 at 29.

[231] *Fogel v. Collins*, 531 F.3d 824, 833 (9th Cir. 2008).

[232] Docket 105 at 22-23 (distinguishing *Hunt*).

substantial or motivating factor in the adverse employment action."[233] "If [a plaintiff] establishes such a prima facie case, the burden shifts to the government to demonstrate that (4) it had an adequate justification for treating [the employee] differently than other members of the general public; or (5) it would have taken the adverse employment action even absent the protected speech."[234] All of the elements "are necessary" and "failure to meet any one of them is fatal to the plaintiff's case."[235]

### 1. Matter of Public Concern

The first step, whether Kerr spoke on a matter of public concern, "is purely a question of law" that depends on the "content, form, and context of a given statement, as revealed by the whole record."[236] "Speech addresses an issue of public concern 'when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest.'"[237]

Kerr spoke at a public Assembly meeting during the COVID-19 pandemic

---

[233] *Adams v. Cnty. of Sacramento*, 116 F.4th 1004, 1010 (9th Cir. 2024) (quoting *Barone v. City of Springfield*, 902 F.3d 1091, 1098 (9th Cir. 2018)).

[234] *Id.* (alterations in original) (quoting *Barone*, 902 F.3d at 1098).

[235] *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 n.4 (9th Cir. 2013) (en banc).

[236] *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009); *Moser v. Las Vegas Metro. Police Dep't*, 984 F.3d 900, 905 (9th Cir. 2021) (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)).

[237] *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 777 (9th Cir. 2022) (quoting *Lane v. Franks*, 573 U.S. 228, 241 (2014)).

and expressed his views on whether a mask mandate should be enforceable. The parties do not dispute, and the Court agrees, that this is a matter of public concern as it related to a political and social matter of community concern, and is the subject of legitimate news interest.[238] Therefore, the Court finds that Kerr has satisfied the first element.

## 2. Private Citizen or Public Employee

Regarding the second inquiry, whether Kerr spoke as a private citizen or public employee, "[a] person speaks in a personal capacity if he 'had no official duty to make the questioned statements, or if the speech was not the product of perform[ing] the tasks [he] was paid to perform.'"[239] Courts "look to three non-exhaustive factors to make this assessment: (1) whether 'the employee confined his communications to his chain of command'; (2) whether 'the subject matter of the communication' fell within the plaintiff's regular job duties; and (3) whether the 'employee sp[oke] in direct contravention to his supervisor's order[].'"[240] "[T]he inquiry into the protected status of speech presents a mixed question of fact and law, and specifically . . . the question of the scope and content of a plaintiff's job

---

[238] Docket 75 at 72 ("As to the first element, protected speech, there is no reasonable dispute that the speech is a matter of public concern as the superior court granted summary judgment on this issue a matter of law."); Docket 86 at 32 ("Defendants appear to concede that Plaintiff was speaking on a matter of public concern[.]").

[239] *Dodge*, 56 F.4th at 778 (alterations in original) (quoting *Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1127 n.2 (9th Cir. 2008)).

[240] *Greisen v. Hanken*, 925 F.3d 1097, 1111 (9th Cir. 2019) (alterations in original) (quoting *Dahlia,* 735 F.3d at 1074-75).

responsibilities is a question of fact."[241]

Defendants maintain that Kerr confined his speech to the chain of command because if "Kerr has concerns about law enforcement policy issues in the Borough, his job duties include raising those concerns first to Manager Giesbrecht, and then being available to the Assembly to answer questions and provide context, if Manager Giesbrecht thought necessary."[242] Defendants place the Assembly within Kerr's chain of command because Kerr's supervisor—Giesbrecht—"works for the Assembly."[243] As to the second factor, in Defendants' view, Kerr's "speech undeniably concerned subjects explicitly made part of his regular job duties by his job description, and was made to a body that is responsible to the citizenry for the policies, procedures, and administration of his department."[244] Regarding the third factor, Defendants contend that Giesbrecht and the Borough Mayor granted Kerr permission to speak at the Assembly meeting "because speaking to the Assembly on topics such as this *is part of his job duties*, similar to other Petersburg department heads," and Giesbrecht believed Kerr was making a statement to

---

[241] *Dahlia*, 735 F.3d at 1072 (quoting *Posey*, 546 F.3d at 1130).

[242] Docket 75 at 67-68.

[243] Docket 112 at 28.

[244] Docket 75 at 68; *see* Docket 75 at 68 n.294 ("Manager Giesbrecht testified that because masking enforcement was on the agenda at the meeting at issue in this case, it both 'made sense' for Chief Kerr to be on the phone, and that had Chief Kerr been in town that day he would have 'asked him to be there.'" (quoting Docket 75-12 at 4 (Giesbrecht. Dep.))).

"provide information to the Assembly."[245]

As to the first factor, Kerr responds that "[e]ven if the Assembly was in Plaintiff's chain of command, which it is not, Plaintiff went outside the chain by going around his direct supervisor to testify directly before the Assembly."[246] Regarding the second factor, Kerr maintains that "although [his] speech related to policing, his public testimony did not fall within his regular job duties and was not made in the scope of his employment."[247] And, in Kerr's view, disputes of fact remain as to the third factor, as Defendants maintain that Giesbrecht assented to Kerr speaking at the Assembly meeting because it was part of his job and he thought Kerr was appearing in his official capacity whereas Kerr testified that he was instructed to sign up for public comment as a private citizen.[248]

Here, viewing the evidence in the light most favorable to Kerr, the first factor supports a finding that Kerr spoke as a private citizen: Kerr spoke at a public Assembly meeting, and the Assembly is not within his direct chain of command.[249]

---

[245] Docket 75 at 69 (emphasis in original) (citing Docket 75-12 at 5 (Giesbrecht. Dep.)).

[246] Docket 97 at 27.

[247] Docket 97 at 27.

[248] Docket 97 at 29.

[249] *See* Petersburg, Alaska, Mun. Code § 3.08.050 (2025) ("Neither the borough assembly nor any of its members may recommend, direct or request the appointment or removal of any person to or from borough office or employment except as may be otherwise provided in the borough Charter or this Code. . . . Neither the assembly nor its individual members may give orders on administrative matters to any subordinate of the borough manager, either publicly or privately."); Docket 86-2 at 41 (Giesbrecht Dep.) (answering "No" when asked if "any Assembly members [are] considered part of the Chief's chain of command").

Regarding the two remaining factors, disputes of fact remain as to whether Kerr's November 2021 statement to the Assembly fell within the scope of his job duties,[250] and whether Kerr's statement was "in direct contravention" to Giesbrecht's orders.[251] The Ninth Circuit has held that "when there are genuine and material disputes as to the scope and content of the plaintiff's job responsibilities, the court must reserve judgment on [whether the plaintiff's speech was pursuant to his official duties] . . . until after the fact-finding process."[252]

Because the Borough has not demonstrated that Kerr fails the second *Pickering* step as a matter of law, the Court denies the Borough summary judgment on Kerr's First Amendment retaliation claim.

As noted above, because Defendants did not brief Kerr's First Amendment prior restraint claim on the merits, this order does not address that claim.

### b. Alaska Constitution

Article I, § 5 of the Alaska Constitution provides that "every person may freely speak, write, and publish on all subjects, being responsible for the abuse of

---

[250] *See Lane*, 573 U.S. at 240 ("[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.").

[251] *See Greisen*, 925 F.3d at 1111; Docket 75-12 at 5 (Giesbrecht Dep.) (testifying that he thought Kerr was going to attend the meeting to "provide information to the Assembly" but that he had not seen Kerr's statement beforehand).

[252] *Dahlia*, 735 F.3d at 1072 (alterations in original) (quoting *Posey*, 546 F.3d at 1131).

that right." The Alaska Supreme Court has recognized that "a broad *ex ante* prohibition on communication" violates a public employee's free speech rights under the Alaska Constitution.[253]

Kerr brings a claim under the Alaska Constitution for injunctive relief based on the same conduct underlying his First Amendment claims and based on the alleged prior restraints placed on his speech by Giesbrecht. Defendants contend that Kerr's retaliation claims under the Alaska Constitution fail for the same reasons as his federal claims. As outlined above, questions of fact remain on Kerr's First Amendment retaliation claim, and so the Court similarly denies Defendants summary judgment on Kerr's First Amendment retaliation claim under the Alaska Constitution.

As to Kerr's separate claim that "the Borough's July 7, 2022 'Policy Guideline' regarding public statements is an unconstitutional *ex ante* prohibition on Kerr's free speech rights," Defendants contend that it fails as a matter of law because the policy only required that Kerr provide notice of any statements, "[n]othing within the policy allows Manager Giesbrecht to prohibit Chief Kerr from making a public statement," and Kerr "has no evidence that this so-called restraint

---

[253] *See Alaskans for a Common Language, Inc. v. Kritz*, 170 P.3d 183, 203 (Alaska 2007). Damages under the Alaska Constitution are not allowed, "except in cases of flagrant constitutional violations where little or no alternative remedies are available," and alternative remedies may include federal remedies, like § 1983. *DeRemer v. Turnbull*, 453 P.3d 193, 198 (2019) (citation omitted).

was ever applied to him."[254]

However, a jury could reasonably read the policy as requiring Kerr to submit all statements he intended to make to the media, whether in his capacity as Police Chief or as a private citizen, for preapproval.[255] It is immaterial that Kerr did not submit a statement to Giesbrecht per the policy, as the policy applied to Kerr as soon as it was enacted. The Court therefore denies Defendants' Motion for Summary Judgment as to Kerr's claim for injunctive relief under the Alaska Constitution.

### c. State Law Claim – Defamation

In Alaska, a defamation claim requires the plaintiff to show "(1) a false and defamatory statement; (2) an unprivileged publication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) the existence of either per se actionability or special harm."[256]

Regarding the first element, "[a] communication is defamatory if it tends to harm the reputation of another so as to lower him or her in the estimation of the

---

[254] Docket 75 at 86-90.

[255] Docket 32-25 at 1 ("[P]resent to me, in writing, any public statement you wish to make to the Assembly, other Board and Commission, or the media (excluding standard press releases addressing arrests or police criminal investigations within the Borough). This will allow me to review and analyze the statement beforehand, to ensure it is clear from the subject, content and context you are not representing the Borough or Department in your statement (unless it is an official departmental statement) . . . .").

[256] *Olivit v. City & Borough of Juneau*, 171 P.3d 1137, 1142 (Alaska 2007) (internal quotation marks and citation omitted).

Case No. 1:23-cv-00008-SLG, *Kerr v. Borough of Petersburg, et al.*
Order on All Pending Motions
Page 60 of 67

community or to deter third persons from associating or dealing with him or her."[257]

"In determining whether a statement is reasonably susceptible of a defamatory interpretation, the court 'must interpret the statement from the standpoint of the average reader, judging the statement not in isolation, but within the context in which it is made.'"[258]  "[W]hether a statement is defamatory . . . is a question of law."[259]

When the allegedly defamatory statement concerns a public official, "a public official must prove that the statement was published with actual malice."[260] Determining whether an official acted with actual malice "involves a subjective inquiry into a speaker's intent—specifically, whether he knew that his defamatory statement was false or recklessly disregarded the possibility of its falsity."[261]  "To show that a declarant recklessly disregarded the truth or falsity of published material, a plaintiff must show that the declarant entertained serious doubts as to the truth of the publication."[262]  "[A] defendant's incorrect usage of a key term or word whose meaning is reasonably disputed" "does not, by itself, constitute actual

---

[257] Id. (quoting Briggs v. Newton, 984 P.2d 1113, 1120-21 (Alaska 1999)).

[258] Suulutaaq, Inc. v. Williams, 782 F. Supp. 2d 795, 807-08 (D. Alaska 2010) (quoting Knievel v. ESPN, 393 F.3d 1068, 1074 (9th Cir. 2005)).

[259] Alaskasland.com, LLC v. Cross, 357 P.3d 805, 820 (Alaska 2015) (citation omitted).

[260] Beard v. Baum, 796 P.2d 1344, 1353 (Alaska 1990) (citation omitted).

[261] Lowell v. Hayes, 117 P.3d 745, 751 (Alaska 2005) (citation omitted).

[262] Id. (quoting Mount Juneau Enters. v. Juneau Empire, 891 P.2d 829, 838 (Alaska 1995)).

Case No. 1:23-cv-00008-SLG, Kerr v. Borough of Petersburg, et al.
Order on All Pending Motions
Page 61 of 67

Case 1:23-cv-00008-SLG     Document 118     Filed 03/31/25     Page 61 of 67

malice."[263]

Kerr's claim for defamation is based on the statement that Giesbrecht provided to KFSK; specifically, Kerr alleges that the statement contained two false statements that Giesbrecht knew were false: (1) that Kerr filed a "complaint in the form of a timeline"; and (2) that Kerr complained of "harassment."[264]

Defendants contend that they are entitled to summary judgment on the merits of Kerr's defamation claim because the statements in the press release were actually or substantially true, "[n]o reasonable factfinder could decide . . . that actual malice existed," and the statement is a statement of opinion.[265]

Kerr opposes summary judgment, contending that disputes of material fact remain because the "evidence, especially when considered as a whole, gives rise to an inference that both Heideman and Giesbrecht knew that the press release contained false statements, or at least 'entertained serious doubts' as to the truth of those statements."[266]   And, in Kerr's view, the question of whether a statement is one of fact or opinion must go to the jury.[267]

---

[263] *Id.* (citations omitted).

[264] Docket 1-2 at 155; *see* Docket 97 at 3 n.8.

[265] Docket 75 at 38-51.

[266] Docket 86 at 57; *see* Docket 97 at 5-11.

[267] Docket 97 at 11-15.  Kerr relies on *PhotoMedex, Inc. v. Irwin*, for the proposition that a jury must decide whether a statement is an opinion or misrepresentation of fact.  Docket 97 at 12 & n.23 (quoting 601 F.3d 919, 931 (9th Cir. 2010), *overruled on other grounds*, *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 118 (2014)).  That case considered Lanham Act claims and claims under California law.

The Court finds that, as a matter of law, neither statement that Kerr points to is defamatory because neither statement "tends to harm the reputation of another so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her."[268]   First, the characterization of Kerr's timeline as a "complaint," even if a mistake of fact, would not harm Kerr's reputation.   To describe the timeline as a complaint is an immaterial detail.[269]   Second, no reasonable jury could conclude that the statement's characterization of Kerr's timeline as a harassment complaint would tend to harm Kerr's reputation.   While Kerr testified that the reference to harassment "makes [him] appear like [he's] just whining and complaining,"[270] the Court finds than an average person would not lower their estimation of Kerr based on a suggestion that he alerted his employer to potential harassment—an act which is protected by federal law.  Indeed, Kerr himself used the term "harassment" to describe his issues with the Assembly members.[271]

Further, the statements that Kerr believes were defamatory are easily distinguishable from statements that courts have found to be defamatory.   For

---

[268] *Olivit*, 171 P.3d at 1142 (quoting *Briggs*, 984 P.2d at 1120-21).

[269] *Suulutaaq, Inc.*, 782 F. Supp. 2d at 808 ("[M]inor inaccuracies do not give rise to a defamation claim where the article accurately conveys the 'gist' or 'sting' of the matter.").

[270] Docket 75-3 at 10 (Kerr Dep.).

[271] Docket 86-9 at 1 ("Yesterday I made reference to harassment, but this is in terms of the act/dictionary definition 'aggressive pressure or intimidation.'  In no way was my reference of harassment related to the workplace harassment definition which involves race, color, religion, sex[,] gender, national origin, age.").

example, in *Green v. Northern Publishing Co.*, the Alaska Supreme Court held that a newspaper editorial was "susceptible of being reasonably interpreted as meaning that the [newspaper], 'after an extensive investigation,' believed" a state official correctly concluded that the plaintiff "was at least partially responsible" for a pretrial detainee's death.[272]  The Court held that "[s]uch a meaning is clearly defamatory."[273]  And, in *MacDonald v. Riggs*, the Alaska Supreme Court held that "[a]ccusing someone of holding a woman at gunpoint in the aftermath of a vicious attack would qualify as defamatory."[274]

Here, the use of the term harassment by Giesbrecht amounts to, at most, the "incorrect usage of a key term or word whose meaning is reasonably disputed" which "does not, by itself, constitute actual malice."[275]  No reasonable jury could conclude otherwise.  The Court therefore grants Defendants summary judgment as to Kerr's state law defamation claim.

### d.  State Law Claim – False Light

"A false light invasion of privacy claim arises when the defendant publicizes a matter that places the plaintiff before the public in a false light" and "the false light in which the other was placed would be highly offensive to a reasonable

---

[272] *Green v. N. Publishing Co.*, 655 P.2d 736, 738-40 (Alaska 1982).

[273] *Id.* at 740.

[274] 166 P.3d 12, 16 (Alaska 2007).

[275] *See Lowell*, 117 P.3d at 751 (Alaska 2005).

person."[276]  "[A] plaintiff need not show injury to reputation to prevail on a false light claim."[277]

Similar to the Court's conclusion above regarding the defamation claim, any false light in which Kerr was placed due to the characterization of his timeline as a complaint and the assertion that he complained of harassment would not be highly offensive to a reasonable person.  First, there is no meaningful distinction between a complaint as a timeline and a complaint in some other form.  Second, being portrayed as filing a harassment complaint—which again, is protected by federal law—is not highly offensive to a reasonable person.  No reasonable jury could conclude otherwise.  The Court therefore grants Defendants summary judgment as to Kerr's state law false light claim.

As the Court has granted Defendants summary judgment on Kerr's state law claims of defamation and false light, the Court also denies Defendants' Motion to Strike Plaintiff's Expert Report at Docket 80 as moot because the expert report relates to potential damages Kerr suffered because of the purportedly defamatory statements.[278]

---

[276] *State v. Carpenter*, 171 P.3d 41, 53 & n.21 (Alaska 2007) (quoting Restatement (Second) of Torts § 652E (1977)).

[277] *Id.* at 53.

[278] *See* Docket 80-1 at 1 ("James Kerr, the chief of police for Petersburg, alleges his reputation was harmed by the defendants' defamatory statements. He further claims that these defamatory statements have diminished his employment prospects, specifically his opportunity to lead a police department in a larger Alaska community such as Sitka, or Ketchikan. You asked me to estimate the present value of his loss.").

**CONCLUSION**

In light of the foregoing, the Court GRANTS Defendants' Motion for Partial Summary Judgment at Docket 32 and GRANTS in part and DENIES in part Defendants' Motion for Summary Judgment at Docket 75 as follows:

- Defendant Giesbrecht is entitled to qualified immunity on Kerr's First Amendment retaliation claim; the Court grants summary judgment to him on that claim; the Court denies summary judgment to Defendant Borough on Kerr's First Amendment retaliation claim;

- The Court denies summary judgment to Defendants on Kerr's claim for injunctive relief pursuant to the Alaska Constitution;

- Defendants' Motions for Summary Judgment did not address, and this order does not decide, Kerr's First Amendment prior restraint claim against either Defendant; and

- Defendants are entitled to summary judgment on Kerr's state law defamation and false light claims.

The Court also DENIES Defendants' Motion to Strike Plaintiff's Expert Report at Docket 80 as moot.

The Court sets a telephonic trial scheduling conference for April 10, 2025, at 2:00 p.m. All parties shall participate telephonically by dialing 571-353-2301 (Call ID 020262828, Pin 487051) approximately five minutes before the scheduled

hearing time.

DATED this 31st day of March, 2025, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE